I believe we're ready to start. Schwab v. Lloyds Banking Group. May it please the Court. Eric Citron for the Plaintiffs. When it comes to the antitrust standing issues in this case, the defendants are asking you to create a direct circuit conflict with Judge Wood's opinion for the Seventh Circuit in Loeb. We think you should follow Loeb instead, particularly because the Supreme Court just quoted that decision with approval in Apple last week, identifying Judge Wood by name. But really, the reason to follow Loeb is that the facts are virtually indistinguishable. Just like here, the plaintiffs in Loeb did not transact directly with the defendants, but they did hold contracts incorporating a price benchmark that the defendants manipulated. Loeb holds that that injury is proximate enough to come within the broad remedial text of the Clayton Act. And that goes double now, because the Supreme Court has just stressed that when these questions are close, when there's any ambiguity on these kinds of issues, they ought to be resolved by reference to the statutory text, which is broad, covers the plaintiffs here, and is remedial in purpose. Well, I have a couple of questions about that. First of all, when you say the plaintiffs here are in that situation, which plaintiffs are we talking about? Because I might have thought that Schwab is in a somewhat different position. You said the plaintiffs who all have LIBOR-denominated holdings. I didn't think that was true of Schwab. Am I wrong? Well, unfortunately, this case is complicated with who holds what. Schwab holds both kinds of claims. And what I am talking about first is these claims that are expressly denominated in LIBOR-based terms. The defendants are going to try to convince you that the fixed-rate claims are different, and I'm going to try to convince you otherwise. But it's important to note that when it comes to the floating-rate claims, there's really no possible intervening cause between the suppression of LIBOR and the injury that those plaintiffs suffer. On the fixed-rate claims, you have to accept Schwab's allegation that the fixed-rate purchases prices move in lockstep with LIBOR because on these short-term corporate bonds, they look directly to the matching LIBOR tenor to figure out what the price ought to be. Schwab alleges with sworn declarations that that's the case. We haven't been able to even ask the defendants if they contest that point because we have been denied discovery on that point. It may be that we're wrong about that on the facts, but we ought to get a chance to prove it. On the floating-rate instruments, are they issued during the class period, during the period of suppression, or before the period of suppression, or both? So again, there is some complexity. The majority, it may even be the vast majority, were already issued before the suppression even began. So you have this super direct causal link where I'm already holding a LIBOR-denominated instrument and the price term says LIBOR, and the defendants move LIBOR down, and of course I receive less interest because I'm holding that instrument. There are some portion of them that were issued during the class period. There you're going to have a couple of complexities. One is that the LIBOR suppression may have increased between when you bought it and later, and the other is that we just don't think that it's correct that you're going to get an offset completely in the purchase price. How about for ones that were issued during the class suppression period? I think your adversary would say then the causation argument is significantly more complex than for the bonds issued prior to the beginning of suppression. I mean, I think that is a distinction that you could draw. I wouldn't draw it for two reasons. One is, as a legal matter, I don't think you can ever really fault the plaintiff's decision to purchase a LIBOR-based bond as opposed to another bond, and call that an intervening cause of their antitrust injury. This exact argument is made in McCready, that McCready shouldn't be able to recover because she chose to see a psychologist even though she wasn't covered, and the Supreme Court says no, you're entitled to purchase the price-fixed good, essentially, or the antitrust. Isn't McCready really about injury not standing? That's my misunderstanding. That portion of McCready is, I think, about standing, and it's clear that McCready wants to analyze both questions. Is this the kind of claim that the antitrust laws are meant to reach, and is it too remote? So there's a separate heading where the first sentence is, is this injury too remote? Well, there are two different kinds of claims, and I don't want you to choose among your children necessarily in deciding which is better or worse. But they are different, aren't they, in the sense that, one, in the case of someone who purchases a LIBOR-denominated instrument during the period when the suppression is going on, you do have this direct privity issue, which, at least to a simpleton like me, looks like that must be somebody who is an efficient enforcer. They bought the thing, the price of which was being fixed. On the other hand, as you sort of illustrated, the people who already held LIBOR-denominated instruments look, in a certain way, more directly affected. They've got something that they bought in good faith when there wasn't any problem going on, and then the price-fixing conspiracy operates in such a way that they get less interest than they should have gotten under the deal that they made. So there is this sort of direct causation without privity, in a sense, while in the other case, there's privity without direct causation. And this brings us to Apple, where we had five justices thinking that direct purchase is a big deal in this area of determining who's an efficient enforcer, while you have four justices pooh-poohing that, ridiculing it, saying, no, no, no, that's not what we talk about at all. We think about proximate causation. And I could imagine, maybe you'll disagree, that which way one looks at it might affect which of these two groups of classes, two classes, that's what they are, have stronger claims to antitrust standing. Is there anything, am I saying anything that makes sense? And if not, explain. That makes sense. I think the answer is, it's a close, maybe academic question in this case, although I don't think it's really presented. The district court upheld antitrust standing as applied to all the privity purchasers and the defendants have not appealed or challenged that determination. So it's not really presented here. In my view, or in our view, I would say, the causal connection that comes from holding the LIBOR-denominated instrument is what really matters. The Lexmark teaches that what you care about is antitrust injury and proximate cause. But privity, I think, is also sufficient, because there's no possible intervening legal cause between the defendant's wrongdoing and the plaintiff's injury, because the defendants are selling the price-fixed good. So privity is not necessary. What you really care about is the causal connection. But if the defendants are the sellers of the price-fixed good, and this was your intuition, they're clearly going to be liable as a matter of proximate cause. They are the cause of the injury, unambiguously. And did you say your remark is that it's a small group of purchasers who, where the bond was issued during the class period itself? It's the decidedly smaller group of purchasers. Okay, so the great majority of the bonds were issued beforehand, and then your argument there is that it's just they were holding something, they made less money on it than they thought they were going to make because of the suppression during the class period. That's right. And I think for those who purchased during the class period, that question is one of damages, whether there might be some offset. I think that is a question of proof that might be put to us, but it can't really matter as a matter of antitrust standing. It's possible that we were harmed. Just one other thing about the small portion. At the time that Gilboim was decided, we really didn't know what the relative amount of money was going to be at stake in these non-privity claims, essentially. The worry was that the defendants had control over the benchmark, but really only operated in a narrow slice of the market, and there was going to be massive liability. Just turns out that that's not right. The vast majority of the harm in this case is related to the derivative transactions. The bondholders are not going to be adding, I think, even material amount of liability to companies that have $25 billion in income each year. That concern just did not end up being presented, I think. Could I ask another question, rather abstract, I'm afraid, and I'm going to ask Mr. Katyal the same question. What are we to do with the moving target quality of Supreme Court precedent in this area? You're talking to us about the recent decision in Apple and about Lexmark, which isn't an antitrust case at all. Then we've got AGC, which seems to set out, which is good for those of us who aren't economists and antitrust experts, a nice cookbook, here are the four factors you look at kind of approach, which seems to me, just as a lawyer, not as an antitrust expert, to be the controlling precedent because that's what speaks directly to the issue that is before us. Then we have all the ... My next thought would be, the Supreme Court tells us, don't guess that we're going to overrule something because we said something in a Lanham Act opinion. That wasn't their exact thing, but that's applied to this case. Don't guess that that's going to change a precedent that you're bound by and you should live with. You haven't mentioned that case. Is that really the law that we should be applying, or is there something that's changed in these many cases that have come down from us and from the Supreme Court since the briefs were filed? I mean, I think happily enough, there is a kind of resolution of this particular issue that's available in this case, which is we're not arguing and have not argued that AGC has been overruled or anything like that. You should continue to look to the factors laid out in AGC to determine antitrust standing. The difference, I think, is that the Supreme Court has helpfully clarified that those factors are four factors that help you identify proximate cause, and that proximate cause is your concern at the end of the day. You can't treat those as independent tests that you can balance in different ways that will eventually lead to the conclusion that even though this plaintiff was proximately injured and had an antitrust injury because of what these defendants did, were nonetheless denying standing. Well, that too. I mean, one of the factors is directness of causation, right? And now you're telling, so you're saying, oh, it's still the same factors, but it's usefully clarified, and it sounds to me what you're saying is it's usefully clarified in such a way that only one of the factors really matters, and the other three don't have any proximately are people injured, which doesn't sound like what the AGC said. I mean, I think I disagree with that. I think if you look carefully at the AGC factors, all of them do relate to proximate cause just in different ways. Lexmark itself points out that the first two of the AGC factors are pretty similar and pretty related directly to proximate cause. The third factor is the speculativeness of damages. Well, before we get there, even the second one, it's the existence of more direct victims. That doesn't usually, you know, if you're doing a Palsgraf tort analysis of proximate cause, it doesn't seem to me that you ask the question, oh, somebody was directly injured by the bomb, so given that, that changes the proximate causation inquiry to somebody down the road, who, you know, you look at how close is their injury, not is there somebody else standing around who's for sure a good plaintiff. Yeah, so I think that's helpful, because it clarifies what more direct means in this context or, you know, a more directly injured victim. What we mean is not just there's some other victim who was injured in a way that we're more certain about. What we mean is that there's someone who is one step closer causally to the injury, and if your claim is derivative of their claim, right, then you don't have proximate cause. The, as, you know, what Justice Scalia says in the Lexmark footnotes is, you know, we have this idea that proximate cause usually doesn't go beyond the first step, and so that point that we're pointing out, you can't just use it as like, well, that person was hurt, and I'm really certain they have antitrust standing, so you don't. That's actually what's going on in Apple, too, right? The Supreme Court is not going to accept, and it makes clear that, you know, a bottleneck monopolist might be liable on both sides, even if we're quite certain the app developers have antitrust standing, the consumers might, too. And then when it comes to speculativeness of damages, you have the same kind of helpful clarification. What we care about is proximate cause. We want to know if you have the kind of injury that we can see non-speculatively would follow from what the defendants have done, but that it's hard to calculate doesn't give what the Supreme Court called a get-out-of-court-free card. So I think what the useful resolution of your question is to interpret those factors in light of proximate cause, to use them to point to proximate cause, and not as sort of independent factor tests that you could use to throw somebody who has a congressional cause of action out of court. I guess I'd like to reserve the time I don't have for rebuttal. Thank you, Judge Livingston. May it please the Court. The district court was right. There are serious personal jurisdiction and antitrust standing problems here. And I'd like to begin with personal jurisdiction, both because it's clear and because it will knock out all of the plaintiff's claims so you don't have to reach these antitrust standing questions about moving target, which we don't think exist for reasons I'll say later. So on personal jurisdiction, the district court correctly found that there was no suit-related conduct anywhere in the United States. And Walden and Waldman teach that the defendant's forum conduct must make out an element of the plaintiff's claims. Okay. Now, first of all, even interpreting that as narrowly as possible, how can you even say that there's no conspiracy-related conduct when there are allegations, which we have to take as true, that bankers in the United States for some of the defendants participated in the setting of LIBOR? And as I read it, the district court says, yeah, well, but that's like trivial or there aren't enough of them, or I don't really believe that that happened, and then moves on. Don't we have to at this stage accept that those things happened? And if they did, doesn't that alone solve the personal jurisdiction problem? No. So, Judge Lentz, three background responses, and then I'd like to go into any specific piece of evidence you or your colleagues want to talk about. The first is, at most, it would only mean, even if one of those documents existed, it would only extend jurisdiction to that one defendant. It wouldn't mean that the other defendants get it unless you adopted their very expansive view of conspiracy liability, which no court has ever actually adopted and applied. Did we say something like that in Schwab? Oh, I don't think so. I think in Schwab, I think Schwab left, you know, was written against the backdrop of this Court's decisions in Bertha Building and Lisko, which required something more than just some loose conspiracy or something like that. An overt act to further inspire a co-conspirator. That's certainly part of it, but it certainly didn't say that was enough, because if that was enough— Are there differences between loose conspiracies and tight conspiracies? Well, I think that the big difference, as Judge Friendly's opinion in Lisko says, is that if someone is acting under the direction, supervision, and control, then it's much more like accessory, principal-agent relationship, to use, you know, the kind of RICO examples that you've written about. But when you're dealing with something like a loose conspiracy in which it's just two people who don't have direction and supervision, that's one in which no court has adopted the idea of that kind of conspiracy jurisdiction. And if, Judge Livingston, if you did decide that in Schwab, then Lisko would have had to have come out the other way. And, Judge Lynch, you asked exactly that question to my friend, Mr. Goldstein, at the last argument. You said, I'm troubled by this because it would mean that that partner, Kerman, wouldn't, would have been, that would have been sufficient jurisdiction, and, you know, I don't think that you decide, Schwab overruled that. I think you just left that to one side. So one point— Also, I mean, what about the entire criminal law? Yeah. Does that have no bearing on this? Because I'm used to that law. Right. And I'm used to the idea that if one person who's part of a conspiracy commits one act in a jurisdiction, that grants what is usually styled in the criminal context as venue to prosecute the entire conspiracy in that place. And, you know, we don't normally think of personal jurisdiction in the criminal context, but in a conceptual way, that's always what's at stake. Often what happens is if you're arrested in a place that's very old-fashioned, it's a species of tag jurisdiction, but that creates personal, that's what creates personal jurisdiction. But in a lot of these cases, somebody gets arrested in California on an indictment in New York, and we bring them in here because he was never in New York, but another guy was. Exactly, Judge Lynch, and this Court's already resolved that, both in Bertha Building and Society General, which are both conspiracy cases in which they've said the rules about No, that's not Pinkerton liable. That's about where the case is going to be. All of it. But what they say is personal jurisdiction is different, and it's so for a very simple reason. It goes to the Supreme Court's decision in Walden, but traces all the way back, which is personal jurisdiction is always about a defendant's form-related conduct, not those of others. Now, it's one thing if you're acting really through someone in a principal agent-like circumstance, but no court, to my knowledge, has ever adopted anything broader than that. If this Court, I think, shouldn't be the first, and indeed this Court's decision in Waldman says criminal jurisdiction and personal jurisdiction in the criminal context is much, much looser. I mean, indeed, you can render someone in, like Manuel Noriega, even if they haven't been in the United States. So it's a really different concept, and this Court's decided that. And like, why? Why is it different? Yeah. I mean, criminal is a much greater imposition on these folks who are somewhere outside the country. It's a greater imposition, but it's also a greater harm because it's a crime. And the theoretical underpinning, which Bertha Belding even says, is that mere foreseeability is never enough for personal jurisdiction, but it's always enough for conspiracy liability. So that's really it. Can I ask another? I'm sorry. I've asked a lot of questions. Why don't you take over? No. I mean, the complaint alleges, in fact, that one of the banks admitted that all the panel banks submitted their suppressed LIBOR bids to Thomson Reuters in New York. Right. So this, Judge Sullivan, I think is exactly the problem. And it goes to Judge Lynch's thing in which you were saying you thought that Judge Buchwald was actually weighing the evidence or something like that. Uh-uh. Let's take that example. That is a Rabobank example. They cite the Court of Appendix, page 5. You can look at Court of Appendix, page 5. There's nothing about that at all. There is something on page 342 which quotes a Rabobank, not a LIBOR submitter, but just a money market trader saying he, upon his belief, he thinks that there were submissions made by Rabobank to Thomson Reuters. Now even at most, if you credit that for everything it was worth, it would get them Rabobank. It wouldn't get them the other 17 defendants, all of whom have sworn affidavits to Judge Buchwald saying all of this activity took place in London, everything. So and then I think she wasn't even weighing basically the Rabobank statement versus the Rabobank declaration which says all of this took place in London. What she said, which I think follows from this Court's decisions applying Twombly, is you know, there was no actual personal knowledge there whatsoever. This guy wasn't even doing LIBOR submissions and here you've got a declaration from the guy who's doing it and the general counsel of Rabobank saying everything took place in London. So every time you hear one of these statements, there's a lot of innuendo about what these underlying documents say. We'd urge you to look at the actual underlying documents, which is what Judge Buchwald did. What about the allegations related to J.P. Morgan? And here they're, Jamie P. Patterson, who I understand is higher up in the hierarchy than the LIBOR people in London, their references to emails from one of Patterson's subordinates talked with Jamie this morning and we are doing a great job with the setting on the low side, but we could just tighten up a little going forward would be a great big help to us on the USD loan desk. I get that that may not prove to be an overt act after some discovery, but why isn't that enough to suggest at the pleading stage that this could be an overt act involving conduct in the United States? Because the critical question is whether or not LIBOR submissions were directed from the UK. Don't do that. And as Judge Buchwald said, she weighed that statement, Judge Livingston, against, and this is at S.P.A. 4929 and 30 and S.P.A. 7736 to 38, sworn statements from J.P.M. saying, quote, J.P.M.C. submissions were both determined and submitted by individuals located in the UK, not individuals located in the United States. And she's not weighing the evidence and saying, oh, I. Determined the bid, that says. Determined and submitted. Submitted in London. But if somebody in New York whose higher ranking says this is the general strategy, but he doesn't actually set the bids, you're saying that doesn't matter? No, I'm saying, Judge Lynch, that there is no evidence and certainly no plausible allegation to meet the Twombly standard that that person in New York actually in any way influenced the bid. And there's a lot of evidence in the record that says all of this from J.P.M.C. took place in London, not the United States. All of this is the problem. Judge Livingston quoted somebody high in the hierarchy as having cheerlead, right? If my boss cheerleads that I'm doing a great job doing a conspiracy, the fact that I decide whether coming in low is 2.1 or 2.15 doesn't seem to me to make me the only person who's important in making decisions, right? I mean, what am I missing? No, I think what you're missing is the fact that that, you know, there's all sorts of to have and plausibly alleged to have any impact on the underlying price. And there is evidence in the record that says that, for example, that Andrew Singer, who was managing J.P.M.C. Morgan's desk, didn't have any authority over the LIBOR submitters who was the person getting that very document. So and tighten up, if anything, means go up, not go down. And it's only on a given day. So our point to you is even if you thought that that meant everything they're saying, I don't think it would ever reach the substantial or meaningful requirements that is required for personal jurisdiction. I want to come back to it in another maybe more fundamental issue, which is the scope of the conspiracy. What we said in Gelboim, and for what it's worth, you don't have to argue to me anyway too much about the mandate rule, whether that's part of our mandate is a somewhat different question. But what we said was that there's a conspiracy, plausibly alleged, that has two goals, one being projecting financial stability, the other being profits. And let's even say maybe those are only one. I guess one question I have is, why do you want to project financial stability? So we do think that Gelboim 2 only had one, not two, and I'll explain why in a second. But the reason to project financial stability, as this court found in Gelboim 2, which you of course were on, was the idea that after the financial crisis of 2007, the banks wanted to hold themselves out as being able to borrow cheaply, just like if I got a mortgage or something like that, if I had a low interest rate, I could say, hey, I'm a creditworthy guy. Yeah, duh, right. So in other words, you project financial stability in order to get better borrowing costs. And at the same time, you're also directly impacting your borrowing costs. And you're saying these two things have nothing to do with one another, that when you're going out into a market in the United States and selling billions, trillions of dollars worth of products that are essentially borrowing money from capital sources in the United States, that it's not part of our deal here to be directly suppressing our borrowing costs, because all we're really doing is trying to look good credit-wise so that we will lower our borrowing costs. What sense does this make? Your Honor, it makes the sense that you yourself said when you joined the panel in Gelboim 2. That's where I joined this piece. Okay. So, or your colleagues. Where Judge Jacobs. Exactly. And so what they said was this is. With some guidance that now everybody's arguing about. Right. And what you said. But you also applied it, I think, in Schwab 2. I think in both cases, and that one you were, of course, on, I think in both you're recognizing that it's a really weird thing for the 16 largest banks in the world to be net borrowers. After all, they're not in the habit of holding. Is it a question of are they net borrowers overall on their balance sheet, or are they net borrowers of LIBOR-denominated products, which I have no idea what common sense would tell me about that. And if you have no idea, Your Honor, then you have to throw this out because they have the burden under Twombly of showing a plausible allegation that they are net borrowers. That's what you said in Gelboim 2, or what the panel said in Gelboim 2. And I think what Schwab did when it rejected the California fraud claims is saying, hey, that has nothing to do with the conspiracy to manipulate LIBOR. Those are fraud claims. Correct. That's a somewhat different concept than what is the goal of the very antitrust conspiracy that we're talking about. Right. And if the goal of the underlying antitrust conspiracy, which is what you described it in Schwab itself, a LIBOR manipulation scheme in order to project financial soundness or something like that, then sales by all these other folks don't matter. Sales alone may not, you know, on a sales theory, maybe that doesn't work. But on an effects-based test, if the conspiracy was about projecting financial health, and you know you're going to be selling a lot of instruments in the United States, and others will as well, and that that will cause harm to people in the United States, it will also give you access to capital markets here. It's very important in a time of financial uncertainty. I'm not even sure if it matters much whether you say it's financial health or profits. It seems like you're projecting into the United States, sort of like the National Enquirer did into California. But I think what this court said in Schwab at pages 87 and 88 is that type of background knowledge is not enough. Mere foreseeability is not enough. And so... No, I agree with that, but I'm asking, isn't there more than foreseeability here? You have certain knowledge you're going to, your cause, and the same way National Enquirer knew Shirley Jones' reputation would be injured in California, that they were selling in California their newspapers. But under the Supreme Court's decision in Calder, it's more than that. It's got to be intentional and tortuous. And at most, you have something like recklessness, I guess, or something, but it's not going to meet the express aim. How is it reckless? How is it negligence or recklessness to form a conspiracy to suppress a benchmark that has a direct impact on one's borrowing costs and then go into, project oneself deliberately into a market where that impact is going to be felt and sell billions of dollars' worth of products? Why is that recklessness rather than directly going into the markets of the United States with products that you have fixed the price of? Judge Lynch, that's a question for them, not for us. In other words, it's their burden under Twombly to say that there is a plausible allegation that that happened. They have had years... I mean, what if that, what if what I just said isn't agreed as what happened? That we intentionally did that? We disagree manifestly. Well, of course, that goes to the merits, isn't it? I mean, the question, the question is, it is plausibly alleged, that's what the basic holding of Galtmoyer and the most holding holding of Galtmoyer, it is plausibly alleged that there was a conspiracy to suppress this benchmark number. Second, it is, I think, a matter of historical fact that no one contests that products denominated with that benchmark profit were sold in the United States by the very corporations that engaged in that conspiracy. Now, why is that just like, oh, it's foreseeable that that would affect the U.S. markets. Why isn't that going directly into the United States with your price fix widgets? Judge Lynch, for exactly the reason you and Judge Livingston said in Schwab at page 88, which is at most that suggests a projection worldwide to try and manipulate LIBOR and make some, you know, make some profit, but it's not expressly aimed at the United States. And that's the test. You said it. That was the test. And even if you think it's intuitive that maybe there's a document somewhere in there that they were aiming it at the United States, they've never been able to come up with one. That's the problem. Isn't there a difference between the context aimed at California, right? And I think that paragraph, I haven't read it in a while, but I think it specifically says that nation-based context may be different. And aiming at the United States, aiming at a premier capital market at a time of financial uncertainty and wanting to be sure you have access to capital there, the aiming might be a little different than California. So you said that even if the defendants knew it was, quote, likely to reach an economy as large as the United States, it does not mean that the defendants' conduct in London was expressly aimed at this country. And that's exactly our point. So, you know, maybe they've demonstrated some global thing, but they have not demonstrated aiming at the United States. And that is what is needed for this effects test. And the Supreme Court has been really cutting back on the effects test and policing it in If I could turn to Antitrust Standing for a couple of moments. So the district court's analysis of directness reflects this court's concern, I think, with damages being disproportionate to wrongdoing, most recently in the 7W57 decision. And if you accepted his invitation to say, oh, you've got to follow the Seventh Circuit's decision in Loeb, I think you would be running headlong into the, you know, billions of dollars of liability that 7W57 and, indeed, Gelboim 2 talked about. For each category of defendants, the district court here distinguished between those whose instruments incorporated LIBOR due to defendants' choices, such as the OTC plaintiffs, and those who incorporated LIBOR as a result of independent choices of third parties. Now, Judge Lynch, you asked and said, well, there's a lot of confusion in this area. So we'll start with Lexmark. Lexmark, I mean, this court just a couple weeks ago, post-Lexmark and 7W57, cited the same exact four factors. And I think for reasons that our brief explains about Lexmark, that Lexmark was a decision about prudential requirements, not statutory ones. And of course, Antitrust Standing is a statutory one. And as you said— Which court's made up for prudential reasons, and now we call it part of the statute. But I do think it has a different analytic line. I understand. I understand. I mean, this—you know, what you're telling me is kind of what I was asking your friend, which is, we've got a case that says this is what the law is, and don't we have to follow it? I mean, I said I was going to ask you, and I guess I'm getting your answer. Yes. It's at least that, but it's also, I think, a little more, because you were also asking my friend and saying, well, the difference is, when in Lexmark, you're really asking, can anyone sue? Here in Antitrust Standing and Efficient Enforcer, this part, you're asking, who's the best party to sue? And it's a comparative analysis. And so for that, and for the reasons that we explain in the brief, you know, the idea that you can have this kind of cause of action, which if you allow them to sue—and this is what you recognize in 7 West 57—you are going to allow any one of the people on the wrong side of a LIBOR transaction, which is literally trillions of dollars in the economy, to be able to sue. And that kind of open-ended liability is something that I don't think that the antitrust laws would countenance. You had also asked about Apple. And so with respect to Apple, you know, that is a decision purely through and through about something else, about antitrust injury. And these are two analytically distinct things. And I could imagine maybe one day the court connecting them, but the Areta Treatise and others say, no, they're really treated as two different things. So in particular, Illinois BRIC is about who can sue it all. This is about who comparatively is best suited to sue. And the reason why this is so important is not just the trillions of dollars in liability. It's also the fact that the defendants, who's had their claims dismissed on antitrust standing, never profited a dollar off of this stuff. So if these are bonds that are issued, or financial instruments that are issued by third parties, sold by third parties to the plaintiffs, the defendants have nothing—they don't get any revenue stream off of that. How does that differ from the general notion of umbrella standing? I mean, isn't the—I mean, I don't know if I can cite a Supreme Court case, but aren't there quite a number of cases in the lower courts that—and maybe some—you know, it's hard to keep track of all these things. You're in better shape than I am to tell me. But if we were talking about things, physical things that get sold, aren't there plenty of cases that say that if people conspire, who are a cartel who control most of the market, to fix the price of brooms, trucks, whatever, and someone buys a truck from someone not involved in the price fixing, that the cartel is responsible for that. Are you saying that's wrong, or are you saying that doesn't apply to something like this? We're saying both. So first it's wrong because actually there are only two Seventh Circuit cases that adopt umbrella standing, and the lion's share of cases rejected—indeed, even this court in Galboim too—sounded a lot of concerns about it, and citing the Midwest Paper decision from the Third Circuit about the open-ended liability that would otherwise adhere. So I definitely don't think that the trend of the case law or anything like that is anything in favor of umbrella standing. So that's point one. And then point two is I don't think that those physical market cases really apply here, because physical markets are at the mercy of the laws of supply and demand, and the only way you avoid a price impact from a defendant's conduct is if you have some sort of preexisting contract not tethered to the current market. By contrast here, the only way in which the plaintiffs are injured is if they or third parties made some independent decision to incorporate LIBOR. So what can— But how about the plaintiffs who purchased their bonds before the suppression period began? They made determinations? It seems pretty direct and pretty hard to distinguish from the plaintiffs who purchased directly from the defendants. So that's their best argument on that. Obviously, it then runs into that other problem of the Newman case, because if it's pre-suppression purchases, it's hard to show that they are injured in any way. But with respect to that on directness, I think that's their best argument. Unfortunately, they have no case that actually says that the timing matters, that the real question is whether or not someone bridged the gap between plaintiff and defendant. So if you look at Hemi Group or you look at ONSA, the two Supreme Court decisions on this, they say that's the relevant question. Is there a direct connection? Is there something going on between the plaintiff and the defendant, or does it require a third party? And they don't ask about the timing. So for example— I mean, when you say there's no case, this is a somewhat unusual case. You know, it's a little hard to say, well, something like this never came up in the world of widgets, and so there's no case like this. Well, yeah, right. But the question is, how do we apply some basic principles? Let me try a thought and see what your reaction is to it. I would have thought that one reason why there might be a difference in timing is that if people are making decisions during the suppression period, they kind of know what LIBOR is. They also have a notion of—you know, at that moment, they just know what the number is. They also have access to some of the information that started people wondering about this conspiracy in the first place. But there are other benchmarks out there that are at different levels. So when I sit down to decide whether I'm going to lend you money at a certain rate, I'm ultimately interested—yeah, I got this floating rate thing, and how is that going to be impacted in the future by what benchmark we set? But I also know perfectly well what the interest rate is today. And if I decide to incorporate LIBOR rather than something else, if I set the premium above LIBOR for that as this is the rate at which I'm prepared to lend, you know, that starts to sound like it's not a—you know, it's not like setting the price of trucks or broomsticks. So Judge Lynch, when I first got into this and started reading, my intuition was exactly like yours. Why wouldn't that make—why wouldn't that be the way that this should work? It turns out, though, actually this is something the courts have spoken on, and in particular in relationships and foreseeability are two very different things. And this court applied that in the local laborer's case to say that even if a defendant willfully, intentionally is using a third party to cause an antitrust injury, if you're doing it through the third party, that breaks the chain of causation. It is an indirect relationship. And the reason for that—I think the reason why this—it sounds a little counterintuitive, but I think the reason is because when you're dealing with efficient enforcer standing, you're dealing with treble damages in the antitrust context, which are massive, and you're trying to ask who is the best party situated to bring the claims and not lead to a massive specter of liability. And so that's why I think the courts would say—what I think you said in the local laborer's decision, that even if you know what the price impact would be as a defendant, that's not enough. It's still going through a third party, and that's the problem. If there are other questions? Just a few things on antitrust standing, unless there are questions about jurisdiction. I think what my colleague is saying is that you really should not follow Loeb. I understood that to be the opening. That is not a course I think the court should follow. It is the leading decision in this area, and it really analyzes basically every argument that we just had. For example, there is both a transaction-specific part of the price and the COMEX index price. In each of those contracts, they're built the exact same way as the LIBOR contracts. There also is this argument, well, aren't the plaintiffs the intervening cause of their injury because there were other benchmarks they could have picked for those contracts? Judge Wood explains that that can't be right, in part because this is a secret price-fixing conspiracy, and you can't blame the plaintiff. Can I just ask a broader question that may be impossible to answer? But if this bondholder class has standing, whether they bought before or after and they instantly confer antitrust standing on anyone who engaged in a transaction pegged to LIBOR, or can you help me understand what lines you would suggest drawing? I will say one possible consequence is that if you have a LIBOR-denominated instrument, you do have antitrust standing, and that is because the injury is direct. One possible line to draw is that, as Judge Lynch was asking in the jurisdictional context, this is the market. That is, these are holders of corporate sovereign debt. This is the exact funding market the defendants were trying to manipulate. So they're not like tertiary or unexpected or unforeseen, unknown liability of any kind. This is the market the defendants were trying to extract a benefit from, and these people are, you know, it's like intentionally hitting somebody's car who's driving it, trying to hurt the driver, and you see that a passenger is sitting there and saying, well, you know, I don't want to hurt the passenger, so I'm not liable for their injuries. These are the exact same kinds of people. They're just borrowing from somebody else. You know you're going to harm them when you do it, and so you have that kind of liability. If you had maybe, you know, off-the-grid derivative transactions, that's what Gelboim was expressly worrying about, things the defendants couldn't have foreseen, you might have a difference. And then, of course, you have people who don't have LIBOR-denominated instruments. I mean, that's what 7 West 57 is about. There's multiple steps of causation there. This person holds a municipal bond portfolio, not denominated in LIBOR terms, and then suffers harm because that portfolio was devalued in a way that allowed Citibank to seize it, you know, that is a more extended chain of causation on any measure. Just a couple other things. Standing, Apple is unambiguously a standing decision. Illinois BRIC is a standing rule, and we know that because Illinois BRIC affects only damages. You're entitled to an injunction notwithstanding Illinois BRIC, and if you don't have antitrust injury, you can't get an injunction or any kind of relief. You're not the person that the antitrust laws protects. So Illinois BRIC is a standing rule. It's just a subspecies of standing. I had one question about personal jurisdiction. Sure. Which is, as Mr. Katyal said, personal jurisdiction, if we find none, knocks out everybody. And the antitrust standing issue affects only certain categories of people who are before us at the moment. And yet you didn't address that at all. And I'm kind of wondering, like, why? Don't you want to say anything about what he had to say about, I guess my question is, so he had a big argument, spent 20 minutes talking about no infrasound on jurisdiction, and you didn't talk about it on your first round, and you decided not to talk about it on the second round. Care to say anything? Well, I mean, I think it became clear in the briefing that this was going to be a case about what, in the reply, rebuttal, and sir rebuttal briefing, that this was going to be a case about what Schwab means. And I didn't think I had very good chance of convincing this particular panel of what Schwab means. So, but I will say, there's a, I'm happy to try. So a couple of things. There are several acts that we say are in furtherance of the conspiracy that happened in the United States. My colleague did at one point acknowledge that Judge Buchwald was weighing the evidence. It's really clear from her opinion that that's exactly what she's doing. She believes the defendant's declarations. She does not believe the evidence we have. This is documentary proof we have at the pleading stage. We tried to ask the defendants, please tell us who you sent your LIBOR submissions to in the United States so you could publish them. And they said, that's impermissible jurisdictional discovery. We're not telling you. All right. So notwithstanding that we've gotten none of that, we still have all these actions. The stuff involving JP Morgan is particularly clear because Jamie Patterson, if you look at those emails, is clearly the one in charge of all of these communications. And JP Morgan is a US bank headquartered in the United States. There is a reasonable inference that the directions about something as important as LIBOR suppression are going to be coming through or from executives in the United States. And we're just, we're at the pleading stage. We're just trying to create a reasonable inference so that we could ask the defendants some questions and get some documents about this point. So I don't think that's really even a close question. On this targeting issue, I also agree this is unambiguously targeted at the United States in a way that it was not targeted at California. It's US dollar LIBOR fixing. The vast majority of US dollar LIBOR denominated instruments are traded in US tech markets. And I think the best piece of evidence in this regard is the charm offensive from the BBA. That person didn't go to Switzerland. He traveled to the CME and the New York Fed to convince those folks that LIBOR was still a reliable benchmark. That is because the conspiracy is targeted at US debt markets where the defendants are going to raise the debt capital that's going to prevent them from failing during the financial crisis. Charm offensive is part of the pleading allegations that demonstrate that. Yes, absolutely. Now, they're not in a complaint because we still haven't been given leave to amend our complaints to add this stuff. It all emerges after Gelboim and I suppose even after some of it comes out after Schwab. Because this stuff is all secret. Some of it was at the Hays trial in London. This is why we need discovery on these and other issues. I think we don't actually need more discovery on personal jurisdiction because it's quite clear we have it. Also, every single one of the defendants sold billions of dollars of debt instruments in the United States. Honestly, this is not as close jurisdictional question. There's no case in history where a price cartel was actively selling their price fixed goods in the United States was allowed to escape US jurisdiction. Congress passed a statute, the FTAIA, that makes the effects of the Sherman Act extraterritorial. You don't even have to do anything in the United States to be liable. So you're going to create a huge constitutional controversy if you say, actually, the US can't reach corporations who are actively selling in the United States because they're headquartered abroad. So I don't think the jurisdictional issue is particularly close. Just one more thing on antitrust standing that I don't want to forget. As I acknowledged, I think there is a distinction that can be drawn between the fixed rate instruments and the floating rate instruments for purposes of federal law, but the Cartwright Act says in so many words that it does not matter if you are transacting directly with the defendants or not. The California Supreme Court has made unambiguously clear that it is not going to follow federal law on this issue. So even if you view this as problematic for purposes of federal law, I think the California claims have to survive. I mean, it's one thing to say you don't have to be in privity. You don't have to be dealing directly. I didn't think that was the problem with the fixed rate issue so much as if you're looking for proximate causation, it strikes me that it is an inference and it may be something that could be proven. I'm not sure how this all falls at the fleeting stage and so on, but when you're talking about people who say, I'm going to lend you money at 3%, 9%, 50%, whatever. Yeah, in some way, I assume the market for other debt like floating rate debt is going to have some impact on that, just as it's going to have an impact on the price of stocks relative to bonds. There's all kinds of things people can do with their money. And if you manipulate price fix, one kind of piece of that market, one problem is maybe you price fix it to the point where capital starts to flee into other forms of people using their money. But certainly, whatever impact it has, however attenuated it ultimately gets, it affects everybody. And the question is, how attenuated is that impact, right? So is that not a principle of California antitrust laws? No. The reason I was pointing out that that appears in the Cartwright Act is that that is the line the district court purported to draw. So at least that much of it is not correct. I will say, as a matter of approximate cause, the concern you've put your finger on is exactly the right concern. At some point, it becomes too attenuated. The kinds of instruments that are at issue in Schwab are a very particular kind of debt. It is a short-term debt. It is a debt short enough that there is like a matching LIBOR tenor. And Bloomberg even has a tool that allows you to interpolate what the LIBOR would be if there's no LIBOR that matches the exact tenor of these short-term bonds. You know, if it's a month and a half and there's no month and a half LIBOR, there's a tool on Bloomberg you can use to figure out what the month and a half LIBOR essentially is. Because this is the practice of pricing these kinds of short-term instruments by reference to LIBOR is so widespread in the industry, right? Schwab's allegation, which has to be true for present purposes, is that it's as though the bond said LIBOR plus X. We just don't have to write it that way. This is not a case about fixed-rate instruments. This is a case about very particular fixed-rate instruments? Absolutely. And I think that that matters. I mean, no one has actually— It may well matter. It just makes our lives that much more helpful. That's why they pay us the very big bucks. I mean, I think this is also a case about floating-rate instruments. Those are the ones that the district court purported to take out of the case. They are a small sliver of the liability, but they are the whole issue for many plaintiffs. And I think the causation there is really clear. As to the fixed-rate instruments, it is one more step. The Schwab has pointed allegations about these particular instruments. So we're not asking you to go very far. But that is a further complication I will acknowledge. Thank you. Excuse me. Thank you both. Very well argued. Very helpful.